NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12662


UBS FINANCIAL SERVICES, INC. vs. DONNA M. ALIBERTI.



Suffolk.     April 1, 2019. - October 22, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, & Cypher, JJ.



Individual Retirement Account.  Trust, Interest of beneficiary.
    Fiduciary.  Contract, Third party beneficiary.  Consumer
    Protection Act, Standing, Trade or commerce, Unfair or
    deceptive act.




        Civil action commenced in the Superior Court Department on
August 4, 2015.

        Counterclaims were heard by Karen F. Green, J., on a motion
for judgment on the pleadings.

        After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


        Carmen A. Frattaroli for the defendant.
        John K. Wells for the plaintiff.
        Glenn Kaplan, Assistant Attorney General, for the Attorney
General, amicus curiae, submitted a brief.
        David Goldberg & Susan Light, of New York, Robert T. Smith
& Mary C. Fleming, of the District of Columbia, Christian
Kemnitz, of Illinois, & William C. Pericak, for Securities
Industry and Financial Markets Association, amicus curiae,
submitted a brief.

LOWY, J. On appeal from an order granting judgment on the pleadings, we are called upon to consider the legal relationship between the commercial custodian of three nondiscretionary individual retirement accounts (IRAs) and a named beneficiary of those accounts upon the death of the original account holder. Quasi familial conflict following the death of the IRAs' original account holder sparked a lengthy account beneficiary dispute between the plaintiff in counterclaim, Donna M. Aliberti, as a named IRA beneficiary, and the defendant in counterclaim, UBS Financial Services, Inc. (UBS), as IRA custodian. Allegedly fueled by a combination of bureaucratic indifference or incompetence and hypersensitivity to risk exposure, the feud festered for more than one and one-half years before resulting in legal action, commenced by UBS filing a complaint for interpleader.

In counterclaim to UBS's interpleader complaint, Aliberti asserted claims of breach of contract; breach of fiduciary duty; violation of the consumer protection statute, G. L. c. 93A, § 9 (c. 93A); and intentional infliction of emotional distress. A Superior Court judge allowed UBS's motion for judgment on the pleadings as to all claims, but the Appeals Court reversed on all counts but intentional infliction of emotional distress. See UBS Fin. Servs., Inc. v. Aliberti, 94 Mass. App. Ct. 180, 192-193 (2018). More specifically, the Appeals Court concluded

that the pleadings stated facially plausible claims that (1) Aliberti was an intended third-party beneficiary of contracts governing the IRAs with standing to sue for contractual breach, (2) UBS committed a breach of fiduciary duties owed to Aliberti, because IRAs are "trusts" under Federal tax law, and (3) the challenged conduct by UBS occurred in a business context and violated c. 93A.[1]  We granted UBS's application for further appellate review.

On review, we conclude that there is no plausible claim for breach of fiduciary duty, but the facts alleged do state a claim that UBS's conduct violated c. 93A.  More specifically, we hold that the custodian of a nondiscretionary IRA does not owe a fiduciary duty to a named beneficiary of that IRA, where no special agreement or circumstances elevate their relationship above the consumer sphere, which the record here does not support.  We also hold that the interactions between the commercial custodian of a nondiscretionary IRA and a named beneficiary of that IRA occur in a business context within the meaning of c. 93A, and that the injurious conduct of UBS alleged

---

[1] The Appeals Court reversed the judgment on the pleadings entered by the Superior Court as to those counts of the amended counterclaim asserting claims for breach of contract.  See UBS Fin. Servs., Inc. v. Aliberti, 94 Mass. App. Ct. 180, 192-193 (2018).  UBS did not seek further appellate review of the breach of contract issue, and it is not before us.  Those counts were remanded to the Superior Court for further proceedings consistent with the Appeals Court's order.

here plausibly constitutes a c. 93A violation.  We therefore affirm the Superior Court judge's decision as to the breach of fiduciary duty claim and reverse the decision as to the violation of c. 93A.[2]

Background.  1.  IRA background.  This dispute arises from within that sector of the consumer financial services industry devoted to the sale, maintenance, and postmortem transfer of IRAs.  IRAs are a widely used type of tax-advantaged account that provides incentives for individuals to accumulate retirement savings.  See Clark v. Rameker, 573 U.S. 122, 124-125, 128 (2014); Investment Company Institute, Investment Company Fact Book 172 (59th ed. 2019), https://www.ici.org/pdf/2019_factbook.pdf [https://perma.cc/TX83-JFYP].[3]  Congress first enacted the legal framework for IRAs in 1974, to make tax-deferred savings available to workers without access to an employer-sponsored retirement plan.  Congressional Research Service, Traditional and Roth Individual Retirement Accounts

---

[2] We acknowledge the amicus brief submitted by the Securities Industry and Financial Markets Association in support of UBS with respect to the fiduciary duty question, and the amicus letter submitted by the Attorney General respecting G. L. c. 93A, § 9.

[3] According to the Investment Company Institute, about one-third of households in the United States owned an IRA at year-end 2018, with the assets in those IRAs accounting for thirty-three percent of all retirement assets in the United States (or approximately $8.8 trillion).  Investment Company Institute, supra at 172-173.

(IRAs): A Primer 1 (updated May 11, 2018). While IRAs were designed to function primarily as tax-advantaged savings vehicles for the account holder's own future use and benefit, they have since become an important estate planning vehicle, as significant balances may remain upon an account holder's death. The Internal Revenue Service (IRS) contemplates that a typical account holder will establish an IRA "to provide [both] for his or her retirement and for the support of his or her beneficiaries." IRS Form 5305-A (model traditional IRA custodial account agreement).

Although the income tax treatment of IRA assets is complex and dictated by Federal law, nearly all other legal aspects of these accounts are governed by State statutory and common law, and the contractual terms of account agreements as dictated by private financial institutions to consumers. See Sterk & Leslie, Accidental Inheritance: Retirement Accounts and the Hidden Law of Succession, 89 N.Y.U. L. Rev. 165, 174-175 (2014) (Sterk & Leslie).[4] The procedure for transferring ownership of

---

[4] Unlike "qualified" retirement plans sponsored by employers, IRAs (and those who market and sell them to consumers) are not subject to the strict accountability requirements of tit. I of the Employee Retirement Income Security Act (ERISA), including fiduciary standards for plan advisors (29 U.S.C. § 1104), stringent disclosure requirements (29 U.S.C. § 1021), automatic surviving spouse benefits (29 U.S.C. § 1055[a][2]), and the private right of action granted to beneficiaries for breach of fiduciary duty and other claims (29 U.S.C. § 1132[a][1]). See 29 U.S.C. §§ 1003(a), 1051(6)

the IRA upon an account holder's death is among the legal aspects of an IRA dictated by State law.  IRAs are a type of "nonprobate" asset, meaning that upon the death of the owner, title passes in accordance with a contractual beneficiary designation rather than under the provisions of a will.  See G. L. c. 190B, § 6-101 (contract for nonprobate transfer on death not testamentary, meaning valid without will's formalities); G. L. c. 167D, § 15 (IRA beneficiary designations take effect according to contractual terms, "notwithstanding any purported testamentary disposition allowed by statute, by operation of law or otherwise to the contrary").

In Massachusetts, as in most other jurisdictions, State law does not provide regulations or guidelines standardizing or otherwise governing the form or content of IRA beneficiary designations, the procedure for amending them, or the default provisions in the event no beneficiary is designated.  Sterk & Leslie, supra, at 175.  Financial intermediaries each use their own "standard form instruments with fill-in-the-blank beneficiary designations," Langbein, The Nonprobate Revolution and the Future of the Law of Succession, 97 Harv. L. Rev. 1108,

_____

(exempting IRAs from coverage under title I of ERISA).  Whereas ERISA frequently preempts State law actions with respect to qualified retirement plans, litigation concerning IRAs typically involves State law.  See, e.g., Joint Committee on Taxation, Present Law and Analysis Relating to Individual Retirement Arrangements 19 (June 24, 2008).

1109 (1986), and typically, the contractual "framework keeps administrative costs down by limiting the inquiry required of the account custodian at the time of the accountholder's death." Sterk & Leslie, supra at 177.

The contractual change in account ownership appears typically to occur "immediately and automatically" at the moment of the original account holder's death, yet it is not typical practice for a beneficiary to "be able to walk in to the IRA provider's office, present his identification, and get a check for the entire balance payable to himself."  N.B. Choate, Life and Death Planning for Retirement Benefits 259 (8th ed. 2019). Rather, many IRA custodians will not accept instructions from a beneficiary-cum-owner until appropriate documents have been signed (typically a new account agreement) and, where applicable, the account has been "retitled" as an inherited IRA to formalize the change in ownership.  Id.

2.  Factual background.  We present the pertinent facts from the pleadings and exhibits that were before the motion judge, in the light most favorable to Aliberti.  In 2008, Patrick Kenney opened three IRAs with UBS.  The UBS financial advisor who assisted Patrick Kenney in establishing the IRAs, Margaret Kenney, was also his one-time sister-in-law.[5]  At the

_____

[5] We refer to Patrick Kenney and Margaret Kenney by their full names to avoid confusion.

time he established the IRAs, Patrick Kenney was involved in a long-term romantic but nonmarital relationship with Aliberti. When Patrick Kenney filled out the initial account paperwork, he designated Aliberti as the sole primary beneficiary of each IRA.[6]

In establishing the IRAs, Patrick Kenney signed the "UBS Client Relationship Agreement" (CRA), which named Aliberti as sole primary beneficiary below the statement, "At your death, your IRA will be transferred to the beneficiary or beneficiaries whose name(s) are printed below," followed by the advisory, "You may change your beneficiary designation at any time by notifying UBS in writing of the change in a form acceptable to UBS."  The CRA also incorporated terms and conditions of the "UBS IRA Custodial Agreement" (custodial agreement) and "IRA Disclosure Statement," two other documents allegedly included in the set of initial account paperwork mailed to Patrick Kenney for review and signature.

In November 2013, Patrick Kenney completed two UBS "IRA Beneficiary Designation Update Forms" (update forms) in connection with two of the IRAs, one with an approximate balance of $18,000 and the other with an approximate balance of $31,000

---

[6] Patrick Kenney was a resident of Billerica from the time he established the IRAs until his death.  UBS is a Delaware corporation that conducts business in several Massachusetts locations (among others), including in Hyannis, where Margaret Kenney was based.  Aliberti lived in Massachusetts throughout the period of time relevant to this case.

(collectively, smaller IRAs).  Kenney completed the two update forms in an identical manner, writing in the names of four individuals with the notation "25%" next to each.  Those individuals are Aliberti, Aliberti's son, Patrick Kenney's niece, and a friend of Patrick Kenney named Craig Gillespie.  Patrick Kenney completed each of the forms improperly, writing Gillespie's name on the line designated for a "primary beneficiary" and each of the three other names on a line designated for a "contingent beneficiary."

UBS received the two update forms from Patrick Kenney, but declined to process them because they were not properly completed.  Margaret Kenney arranged for new beneficiary update forms for each IRA to be sent to Patrick Kenney for completion.  UBS never received any request from Patrick Kenney to update the beneficiary designation with respect to the third IRA, valued at approximately $276,000 (larger IRA), and no additional forms were ever received with respect to the smaller IRAs.  Patrick Kenney died unexpectedly on December 2, 2013.

Approximately two weeks following Patrick Kenney's death, Aliberti contacted Margaret Kenney about the three IRAs.  That evening, Margaret Kenney sent Aliberti a series of text messages, beginning with a request for her address, but followed by attacks on Aliberti's character, including references to her as "a whore" and "the . . . worst piece of filth I have ever

encountered," and ultimately an accusation that Aliberti had failed to notice errors on Patrick Kenney's death certificate on account of being "too busy ransacking" and "so eager to grab the money." Two days later, Margaret Kenney sent Aliberti another text message stating, "Documents mailed to you today please sign and return ASAP for distribution."

Near the end of December 2013, UBS received a letter from Gillespie's attorney, stating the attorney's understanding that Patrick Kenney had "changed the named beneficiaries on two of the IRA accounts and that he was in the process of changing beneficiaries with regard to the third IRA account at the time of his passing." The letter also stated that Gillespie intended "to have a court of law resolve the issue of whether or not he is a named beneficiary of the third IRA account" and asked UBS not to make any distributions therefrom.[7] The letter from Gillespie's counsel resulted in UBS's classification of the larger IRA as "disputed" in accordance with internal policy, which meant that UBS would take no action with regard to the

---

[7] The letter also contended that Massachusetts law "deems a change of beneficiary to have occurred before the completion of a change of beneficiary form in the event that the decedent has expressed an intent to change beneficiaries, has conveyed that intent to the financial services provider and has substantially completed the change of beneficiary process." Even if this argument gave UBS pause, the theory could not apply to the larger IRA without the existence of an update form completed and signed by Patrick Kenney in connection with that account. No such form was ever produced.

larger IRA unless one of the following occurred: (1) receipt of a court order with instructions; (2) Gillespie's withdrawal of any claim to the funds; or (3) the expiration of all applicable statutes of limitations, eliminating any related risk for UBS.

During the second week of January 2014, Aliberti telephoned the UBS client relations department to complain about the text messages received from Margaret Kenney. During the call, she stated her belief that she was the sole beneficiary of all three IRAs, and the UBS "Client Relations Telephone Log Sheet" generated in connection with that call references the account numbers of all three IRAs. Aliberti had no further communication with UBS until February 4, 2014, when she received an unsigned letter from UBS's "Early Dispute Resolution Group," stating that a case manager had been assigned to her complaint and would respond after review. On February 19, 2014, Aliberti sent completed beneficiary processing forms for all three IRAs, a copy of Patrick Kenney's death certificate, and a copy of her driver's license to UBS.

Five days later, Aliberti telephoned UBS's client relations department to complain a second time, having received a package of new account paperwork indicating that Margaret Kenney remained in control of the IRAs. Aliberti again complained about Margaret Kenney's previous unprofessional text messages and demanded assignment of a new UBS financial advisor to

administer the IRAs.  Near the end of March 2014, UBS removed Margaret Kenney from oversight of all three IRAs, and Aliberti received another form letter from UBS stating that the IRAs had "been updated for Management access only" and that the UBS client relations department would respond to Aliberti's concerns "as soon as possible."  Shortly thereafter, within five months of Patrick Kenney's death, UBS liquidated each of the smaller IRAs, in each instance making four equal distributions of funds to each of Aliberti, Aliberti's son, Gillespie, and Patrick Kenney's niece.[8]  Neither Aliberti nor her son attempted to return funds to UBS.

After receiving these distributions from the smaller IRAs, Aliberti retained counsel to communicate with UBS on her behalf. In early May 2014, Aliberti made a written request, through counsel, seeking information relating to the IRAs of which Aliberti was a named beneficiary, UBS's treatment of Aliberti's complaints, and details of any dispute as to Aliberti's beneficial interest in one or more of the IRAs.[9]  This request

---

[8] Although Aliberti pleaded that distributions were made "without notice," the record suggests that she opened a new account at UBS expressly for the purpose of accepting them.

[9] The letter from Aliberti's counsel acknowledges an "understanding that [UBS] has indicated that there is a dispute as to [Aliberti]'s beneficial interest in one of more Individual Retirement Accounts held by [Patrick Kenney]" but does not elaborate as to how that indication was made.

was sent by certified mail to the UBS personnel who had previously assured her, first in early February and subsequently in late March, that a response to her concerns would be forthcoming. Although Aliberti's request expressly proposed delivery of materials within seven days, UBS failed to respond. Aliberti ultimately resorted to service of a keeper of the records deposition subpoena on UBS. UBS replied, "albeit late."[10]

On August 29, 2014, nearly nine months following Patrick Kenney's death, Aliberti, through counsel, sent a second letter to the same UBS personnel. This letter contained a written demand for immediate distribution of the date-of-death balance of the larger IRA, with appropriate interest and dividends, to Aliberti; a statement of intent to sue failing delivery of those funds within ten business days; and a reservation of Aliberti's rights to contest the distributions made from proceeds of the smaller IRAs. Although UBS failed to respond or deliver payment, Aliberti did not file suit.

On April 2, 2015, Aliberti's counsel deposed Margaret Kenney, who, among other things, admitted to sending Aliberti the text messages that caused Aliberti to complain to UBS's

---

[10] The record contains no further details with respect to the timing or substance of either the subpoena or UBS's response thereto.

client relations department.  On May 18, 2015, Aliberti's counsel sent UBS a c. 93A demand letter, enclosing the Margaret Kenney deposition transcript and exhibits.  The allegations stated in the c. 93A demand letter included the following:  UBS knowingly and willfully failed to provide Aliberti with information to which she was entitled as the beneficiary of an account or accounts held by UBS; UBS serially ignored Aliberti's attempts to communicate for the purpose of requesting information about and distribution of amounts to which beneficiary status entitled her; UBS compelled Aliberti to obtain counsel and issue a subpoena in order to obtain that information; UBS distributed proceeds of the smaller IRAs without first addressing Aliberti's stated belief that she was rightfully the sole designated beneficiary thereof; and UBS refused to distribute the substantial proceeds of the larger IRA to her "without lawful excuse or basis."

UBS responded to Aliberti's c. 93A demand letter in writing on June 15, 2015, denying the legal merit of Aliberti's stated claims.  Further correspondence between the parties in early and mid-July yielded no resolution.  On August 4, 2015, UBS filed a complaint for interpleader in the Superior Court pursuant to Mass. R. Civ. P. 22, 365 Mass. 767 (1974), asking the court to determine ownership of the larger IRA and joining Aliberti and Gillespie as defendants.  Litigation ensued, but by March 10,

2016, all parties stipulated to partial dismissal of those claims by and against Gillespie, resulting in Gillespie's waiver of any claim to ownership of the proceeds of the larger IRA.

Even after Gillespie, through stipulation, withdrew any claim to the proceeds of the larger IRA, UBS still delayed distribution. On June 9, 2016, UBS and Aliberti entered into a limited stipulation and release whereby UBS would distribute all proceeds of the larger IRA to Aliberti "promptly and without delay" in return for her releasing them from liability regarding any claim for disbursement of the funds in the larger IRA. The stipulation expressly acknowledged Aliberti's right to pursue her claims against UBS as stated in her amended counterclaim, including breach of contract, breach of fiduciary duty, and violation of c. 93A. By June 16, 2016, when Aliberti filed a motion to amend her counterclaims against UBS and sought to join Margaret Kenney as a cross defendant,[11] UBS still had not made any distribution from the larger IRA.

UBS distributed the larger IRA proceeds to Aliberti on July 1, 2016, approximately two and one-half years following Patrick Kenney's death. Aliberti continued pursuit of her counterclaims against UBS, and after several months of further litigation, UBS filed a motion for judgment on the pleadings as

---

[11] The Superior Court judge ultimately denied the motion to join Margaret Kenney as a party to the suit.

to those claims.  The Superior Court judge granted the motion, dismissing each of Aliberti's claims.  Aliberti appealed.  The Appeals Court reversed in part, finding Aliberti's claims of breach of contract, breach of fiduciary duty, and violation of c. 93A to be well pleaded.  UBS Fin. Servs., Inc., 94 Mass. App. Ct. at 192-193.  We granted further appellate review to consider whether the factual allegations as pleaded support plausible claims for relief as to breach of fiduciary duty and violation of c. 93A.

Discussion.  1.  Standard of review.  "We review de novo a judge's order allowing a motion for judgment on the pleadings under Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974)."  Champa v. Weston Pub. Sch., 473 Mass. 86, 90 (2015), quoting Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 726 (2013).  We accept the truth of all well-pleaded facts alleged by, and "draw every reasonable inference in favor" of, the nonmoving party, Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011), to determine whether there are "factual 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief."  Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).  See Jaroz v. Palmer, 436 Mass. 526, 530 (2002) (defendant's "motion under rule 12 [c] is akin to a motion [to

dismiss] under Mass. R. Civ. P. 12 [b] [6]," 365 Mass. 754 [1974]).

2. Breach of fiduciary duty. Aliberti contends that UBS committed a breach of fiduciary duties owed to her as the designated beneficiary of all three nondiscretionary custodial IRAs at issue here. To establish a claim of breach of fiduciary duty under Massachusetts law, "there must be a [fiduciary] duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the [defendant's] breach [thereof].[12] Estate of Moulton v. Puopolo, 467 Mass. 478, 492

_____

[12] We conduct the fiduciary duty analysis in accordance with Massachusetts law, as the parties are in agreement that it should apply. The CRA and the incorporated custodial agreement are both governed by New York law. However, the choice-of-law provisions therein relate only to the interpretation and enforcement of the CRA and the custodial agreement, and the parties' contractual disputes are not before us. Further, "only actual conflicts between the laws of different jurisdictions must be resolved," Kaufman v. Richmond, 442 Mass. 1010, 1012 (2004), and we discern no relevant difference between the fiduciary duty law of New York and Massachusetts. See, e.g., Rut v. Young Adult Inst., Inc., 74 A.D.3d 776, 777 (2010) (elements for fiduciary duty claim under New York law). Thus, application of either State's law would yield the same result here. Cf. Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 411-412 (2007) (applying New Jersey law where parties "agree that there is no relevant difference between New Jersey and Massachusetts law and have both employed New Jersey law in their arguments").

In any event, under the particular circumstances of this case the Massachusetts choice-of-law rules indicate that Massachusetts law should apply to our fiduciary duty analysis. See Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985) (Massachusetts follows "a functional choice-of-law approach that responds to the interests of the parties, the

(2014).  See <u>Baker</u> v. <u>Wilmer Cutler Pickering Hale & Dorr LLP</u>, 91 Mass. App. Ct. 835, 842 (2017).  "A fiduciary relationship is one founded on the trust and confidence reposed by one party in the integrity and fidelity of another."  <u>Estate of Moulton</u>, <u>supra</u>.

Fiduciary duties may arise in two ways:  (a) as a matter of law, where parties to the subject relationship are cast in archetypal roles, "such as trustee and [beneficiary], guardian and ward, attorney and client,"  <u>Smith</u> v. <u>Smith</u>, 222 Mass. 102, 106 (1915); or (b) as "determined by the facts established," <u>Warsofsky</u> v. <u>Sherman</u>, 326 Mass. 290, 293 (1950), upon "evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters."  <u>Markell</u> v. <u>Sidney B. Pfeifer Found., Inc</u>., 9 Mass. App. Ct. 412, 444 (1978), abrogated on another ground by <u>Cleary</u> v. <u>Cleary</u>, 427 Mass. 286, 292 (1998), citing <u>Hawes</u> v. <u>Lackey</u>, 207 Mass. 424, 431-432 (1911).  Because the amended complaint does not

States involved, and the interstate system as a whole").  "The Massachusetts functional approach is explicitly guided by the Restatement (Second) of Conflict of Laws (1971) [(Restatement)]."  <u>Clarendon Nat'l Ins. Co.</u> v. <u>Arbella Mut. Ins. Co.</u>, 60 Mass. App. Ct. 492, 496 (2004) (Lenk, J.).  Section 145 of the Restatement states that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties" as determined by factors laid out in § 6 of the Restatement.

adequately plead facts to support the existence of a fiduciary duty under either theory, the Superior Court judge properly granted UBS's motion for judgment on the pleadings as to the counts claiming breach of fiduciary duty.

a. No fiduciary relationship exists by operation of law. The relationship between the custodian of a nondiscretionary IRA and a named beneficiary of the IRA is not among those traditional "familiar and well[-]recognized" relationships giving rise to fiduciary duties as a matter of law.[13] Warsofsky, 326 Mass. at 292. See 1 J. Story, Commentaries on Equity Jurisprudence as Administered in England and America §§ 308-327 (1836) (discussing fiduciary standards governing certain relationships, including attorney and client, guardian and ward, principal and agent, and trustee and beneficiary). More specifically, the record does not support an allegation that UBS and Aliberti are bound by the fiduciary ties of trustee and beneficiary, because no "trust" exists under State law or is required by Federal law.

The IRAs were not "trusts" under State law, because a settlor's expressed intent to create a trust is a prerequisite

---

[13] A securities account is "nondiscretionary" where "the customer makes the investment decisions and the stockbroker merely receives and executes a customer's orders." Patsos v. First Albany Corp., 433 Mass. 323, 333 (2001). A nondiscretionary IRA is one maintained by a custodian or trustee without investment discretion.

to the creation of a Massachusetts trust.  See G. L. c. 203E, § 402 (2).  And there is nothing in the record to suggest that Patrick Kenney intended to create a trust relationship between UBS and Aliberti either in 2008, when he first signed the CRA, or in 2013, when he completed the update forms.  See, e.g., Tucker v. Soy Capital Bank & Trust Co., 2012 IL App (1st) 103303, ¶ 34 (2012) (no explicit language creating trust in governing contract).

Federal law does not alter this analysis.[14]  Although the terms "trust" and "trustee" permeate the section of the United States Code governing IRAs, 26 U.S.C. § 408 (I.R.C. § 408), and the corresponding Department of the Treasury regulations, 26 C.F.R. §§ 1.408-1 et seq., the Federal law does not itself define "trust," nor does it require an IRA to be a "trust" as that term may be defined under applicable State law.[15]  An IRA

---

[14] IRAs are created and governed by Section 408 of the United States Internal Revenue Code, 26 U.S.C. § 408 (I.R.C. § 408), which "establish[es] a framework whereby individuals may obtain favorable tax treatment of amounts set aside for retirement in certain circumstances."  Sirna vs. Prudential Sec., Inc., U.S. Dist. Ct., Nos. 95 Civ. 8422, 95 Civ. 9016, 96 Civ. 4534 (S.D.N.Y. Feb. 10, 1997).  It provides "no implied cause of action against allegedly errant IRA fiduciaries." Grund v. Delaware Charter Guarantee & Trust Co., 788 F. Supp. 2d 226, 235 (S.D.N.Y. 2011), quoting Sirna, supra.

[15] The Internal Revenue Code defines an IRA as "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets . . . [certain] requirements."  26 U.S.C. § 408.  Notably, the

may take the form of either a trust account or a "custodial account."  See 26 U.S.C. § 408(a), (h); 26 C.F.R. § 1.408-2(a).  Where an IRA is created as a custodial account, such as the IRAs at issue here, it is subject to all the same requirements as an IRA structured as a trust account, "except for the fact that it is not a trust" (emphasis added).[16]  26 U.S.C. § 408(h).  See 26 C.F.R. § 1.408-2(d).  Unlike fiduciary duties, most of the obligations imposed on the IRA custodian by Federal law are not to the benefit of the account holder or beneficiary, but rather to assist the IRS in preventing the tax incentives intended to encourage individual retirement savings from giving rise to tax fraud and abuse.[17]

b.  The facts do not otherwise support creation of fiduciary duties.  "The circumstances which may create a

definition is constrained to uses "[f]or purposes of this section" (i.e., for tax purposes).  Id.

[16] Along with other requirements, the type of organizations that may hold and administer IRA assets is limited to either a bank "or such other person who demonstrates to the satisfaction of the Secretary [of the Treasury] that" the IRA will be administered in accordance with required law.  26 U.S.C. § 408(a)(2).  UBS is this latter type of "nonbank" custodian.

[17] An IRA custodian's various reporting obligations (viz. valuing account assets and accounting for contributions and distributions) ultimately provide the IRS with a means of verifying income tax deductions reported by the individual account holder or beneficiary, and allow the account to maintain its tax-favored status.  Joint Committee on Taxation, supra at 20.  See 26 C.F.R. § 1.408-5 (detailing certain reporting requirements).

fiduciary relationship are so varied and so difficult to foresee that it is unwise for courts to attempt to make comprehensive definitions." Cann v. Barry, 293 Mass. 313, 316 (1936). As such, fiduciary duties may arise wherever "faith, confidence, and trust" is reposed by one party "in another's judgment and advice." Doe v. Harbor Sch., Inc., 446 Mass. 245, 252 (2006). See Cann, supra at 316-317, quoting Tate v. Williamson, L. R. 2 Ch. App. 55, 61 (1886) (fiduciary duty arises "[w]herever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other").

The amended counterclaim does not allege that Aliberti ever "reposed trust and confidence" in UBS's judgment or advice. Although Aliberti had to rely on UBS's cooperation in order to realize her ownership interest in the IRAs, this functional absence of choice did not yield a relationship of "higher" trust or entitle Aliberti to special treatment. Although there was a disparity in the parties' positions due to UBS having possession of the IRA assets and unilaterally dictating the terms upon which Aliberti could access them, this particular brand of power imbalance is not uncommon in our modern consumer marketplace and does not, in and of itself, create a fiduciary duty. There is nothing in the record to suggest that the relationship between

Aliberti and UBS was anything more than a retail consumer relationship governed by contract.

IRA custodianship is a recognized line of business in the consumer financial services sector, providing a fairly customary bundle of contracted-for services.[18]  One of those services is transfer of ownership of the IRA or distribution of the proceeds of its assets to the designated beneficiaries upon the initial account holder's death.  Historically, the grave and solemn responsibility of distributing a person's assets after death has been assigned to a fiduciary, such as an executor or trustee, who "is held to something stricter than the morals of the market place," Meinhard v. Salmon, 249 N.Y. 458, 464 (1928), and must account to the probate court.  But the nonprobate transfer of IRA assets is typically contracted for at arms' length, and performed in the ordinary course of business with no more or less gravity or solemnity than other customer instructions.  The nonprobate asset transfer that Patrick Kenney contracted for here is no exception.

The contracts governing the IRAs here do not include language establishing a relationship of higher trust or

---

[18] See, e.g., United States Office of the Comptroller of the Currency, Comptroller's Handbook:  Retirement Plan Products and Services 4 (Feb. 2014) ("Typical custody services include settlement, safekeeping, determining the market value of the assets held, and reporting customers' transactions").

confidence, either between the custodian and the account holder or between the custodian and the designated beneficiary. Because Aliberti is a designated beneficiary of each IRA, she is an intended third-party beneficiary of the contracts between Patrick Kenney and UBS.  UBS Fin. Servs., Inc., 94 Mass. App. Ct. at 187.  These agreements, without which Aliberti and UBS would have no connection, impose a contractual duty on UBS to transfer the IRA proceeds in accordance with Patrick Kenney's instructions, but the contract contains no express or implicit assumption of any fiduciary responsibility.  In fact, the custodial agreement expressly disclaims any fiduciary obligations.

Whereas there is neither "any common-law fiduciary obligation, nor any special relationship of trust, confidence, or reliance," the amended counterclaim fails to state a claim for breach of fiduciary duty under Massachusetts law.  Locator Servs. Group, Ltd. v. Treasurer & Receiver Gen., 443 Mass. 837, 855 (2005).

3.  Violation of G. L. c. 93A.  The facts pleaded in the amended counterclaim support the claim that Aliberti became the rightful owner of the IRAs upon Patrick Kenney's death, and that UBS's conduct unfairly impeded her exercise of property rights

in violation of c. 93A.[19]  See G. L. c. 93A, § 9.  The enactment of c. 93A's consumer remedy provision "created new substantive rights," Commonwealth v. DeCotis, 366 Mass. 234, 244 n.8 (1974), which now extend to any individual injured by the "unfair or deceptive acts or practices" of a business operating in the consumer marketplace.  G. L. c. 93A §§ 2, 9.  The law seeks "to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace" by "impos[ing] liability on persons seeking to profit from unfair practices."  Herman v. Admit One Ticket Agency LLC, 454 Mass. 611, 615 (2006), quoting Poznik v. Massachusetts Med. Professional Ins. Ass'n, 417 Mass. 48, 53 (1994).  To establish entitlement to c. 93A relief, the amended counterclaim must plead sufficient facts to demonstrate

> "first, that [UBS] has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred 'in the conduct of any trade or commerce;' third, that [Aliberti] suffered an injury; and fourth, that [UBS]'s unfair or deceptive conduct was a cause of the injury."

Rafferty v Merck & Co., 479 Mass. 141, 161 (2018).  We conclude that it does.

a.  The amended counterclaim establishes that Aliberti is a proper plaintiff.  That the connection between UBS and Aliberti

---

[19] Although the CRA and custodial agreement include New York choice-of-law provisions, UBS has not challenged the application of Massachusetts consumer protection law in this case.

arises from UBS's service contract with another account holder (Patrick Kenney) does not render Aliberti an improper plaintiff to assert the c. 93A claim against UBS.  We have long held that "[p]arties need not be in privity for their actions to come within the reach of c. 93A."  Kattar v. Demoulas, 433 Mass. 1, 14-15 (2000).  See Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53, 60 (2002) (no privity required because c. 93A "allows any person who has been injured by trade or commerce indirectly affecting the people of this Commonwealth to bring a cause of action" [emphasis in original]).  We recently held that to assert a claim under c. 93A, "[i]t suffices that the plaintiff used the product, even if it was sold to another, and was injured as a result" (emphasis in original).  Rafferty, 479 Mass. at 161.  Aliberti's standing to assert the c. 93A claim is adequately supported here by the allegations that UBS's botched performance of the IRA transfer services promised to Patrick Kenney caused financial injury to Aliberti.[20]

---

[20] Although no party addressed the issue of injury in the briefs, the amended counterclaim alleges that UBS's unfair conduct "[c]ompell[ed]" Aliberti "to retain legal counsel and incur substantial expenses."  Based upon the facts alleged in the amended counterclaim, any legal fees and costs Aliberti incurred in attempted communication with UBS about the larger IRA and associated dispute are distinct from those later incurred in connection with the c. 93A claim, and may be treated as actual damages.  See Siegel v. Berkshire Life Ins. Co., 64 Mass. App. Ct. 698, 703 (2005).

b.  <u>Trade or commerce</u>.  Under c. 93A, the "trade or commerce" requirement is met when the defendant was operating in "a business context" at the time of its allegedly unfair or deceptive activity.  Feeney v. Dell Inc., 454 Mass. 192, 212 (2009).  This is a fact-specific, multifactor inquiry, requiring "consideration of the nature of the transaction, the character of the parties and their activities, and whether the transaction was motivated by business or personal reasons" (quotation and citation omitted).  Id.  See Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 176 (2013) (facts permitted fair inference that "defendants had a profit-seeking motive in constructing and maintaining the hazardous [structural feature that led to decedent's injury] in the context of their commercial enterprise").

That UBS provides custodial IRA services to consumers in the ordinary course of its business, for profit, and under standard form contracts it drafts and presents to prospective customers for signature is fairly inferred from the record, and at least partially conceded.[21]  Cf. Quinton v. Gavin, 64 Mass.

---

[21] Although many of the technical requirements of an IRA are dictated by the IRS, IRAs are not subject to the much more stringent controls imposed by ERISA.  See note 4, supra.  This means that the terms governing these accounts are left to State law (which typically does not apply to retirement plans within the ERISA sphere, due to preemption).  Because there is a dearth of State law specifically regulating the nonprobate transfer of IRAs, however, the account transfer terms (including default

App. Ct. 792, 799 (2005) (trustee subject to c. 93A liability where services were provided "to members of the public in the ordinary course of business" and not for private purpose). In the standard CRA form (as it appeared in 2008), UBS promises the consumer account holder that the "IRA will be transferred" to a designated beneficiary or beneficiaries at the account holder's death. This promise is a critical practical element of the IRA custodian's contracted-for performance, considering that a large balance may remain at the account holder's death, or that an account holder's management of the IRA may have been guided by a wider estate-planning strategy to maximize the assets transferred outside of probate. Sterk & Leslie, supra at 175-176. UBS need not charge a specific fee for this postmortem asset delivery service for its performance to occur "in a business context," because that service is part of a bundle of contracted-for services that UBS performs as IRA custodian in exchange for periodic fees.

The pleadings here contain sufficient factual allegations to establish that the interactions between UBS, as IRA

---

beneficiary provisions and the applicable procedure for changing a named beneficiary) are ultimately left to the discretion and internal policies of the private financial institutions who sell IRAs to consumers. Although these contract terms may have a significant effect on whether a decedent's donative intent is actually realized, consumers typically do not shop around to compare the fine print, so consumer preferences are unlikely to affect market forces. See Sterk & Leslie, supra at 223.

custodian, and Aliberti, as the designated beneficiary of the IRAs following Patrick Kenney's death, occurred in a business context within the meaning of c. 93A. Furthermore, given the consumer context in which the nonprobate transfer function of IRAs occurs, and the public importance of that functionality, we expressly hold that the interactions between an IRA custodian and a named beneficiary of the IRA, following the initial account holder's death, typically occur in a business context within the meaning of c. 93A.

c. Unfair or deceptive practices. "Chapter 93A does not define what constitutes an 'unfair or deceptive act or practice.'" Kattar, 433 Mass. at 13. Instead, we have held that "unfair or deceptive conduct is best discerned 'from the circumstances of each case.'" Id. at 14, quoting DeCotis, 366 Mass. at 242. See Duclersaint v. Federal Nat'l Mtge. Ass'n, 427 Mass. 809, 814 (1998) (unfairness of act or practice "is determined from all the circumstances"). We look to "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Further, in "evaluat[ing] the equities between the parties,"

what the parties, respectively, "knew or should have known may be relevant in determining unfairness." Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983).

Viewed in the light most favorable to Aliberti, there is ample support in the facts alleged that the manner in which UBS conducted itself with respect to Aliberti was "unfair" within the meaning of c. 93A. The amended counterclaim alleges that UBS "(1) denied Aliberti the funds to which she was entitled; (2) for multiple years; (3) without good reason; (4) until she was forced to take legal action and incur unnecessary costs and fees." UBS Fin. Servs., Inc., 94 Mass. App. Ct. at 191. To this litany may be added UBS employee Margaret Kenney's admitted dispatch of abusive text messages in response to Aliberti's inquiry about receipt of IRA distributions; UBS's alleged failure to supervise the IRAs' administration following Patrick Kenney's death (including by not removing Margaret Kenney as the UBS financial advisor until Aliberti had complained twice); and UBS's decision to file an allegedly unjustified interpleader complaint following more than one and one-half years of delay and in light of the foregoing.

The pleadings suggest that there never has been any legitimate question whether Aliberti was the legally designated sole beneficiary of the larger IRA. The CRA reflects that from the time Patrick Kenney opened the larger IRA in 2008, Aliberti

was designated as its sole beneficiary upon Patrick Kenney's death.  UBS admits that it never received any form or other writing from Patrick Kenney with instructions to update the beneficiary designation on the larger IRA.[22]  The CRA and incorporated custodial agreement clearly specify that, to be effective, any instruction from Patrick Kenney to change the IRA beneficiary designation not only was required to be in writing sent to UBS, but also was required to be in a form acceptable to and accepted by UBS, in its sole discretion.

Nevertheless, as reflected in correspondence from UBS's counsel attached to the amended counterclaim, UBS designated the larger IRA "disputed" immediately upon receipt of Gillespie's letter, and the assets remained frozen for nearly two and one-

---

[22] Even in the light most favorable to Aliberti, the allegations do not support a c. 93A claim as to distributions from the smaller IRAs.  Patrick Kenney at least attempted to provide instructions regarding change of IRA beneficiary to UBS by completing and returning the update forms in connection with each of the smaller IRAs; there was no duty to inform Aliberti.  Despite its earlier request for written clarification, several months after Patrick Kenney died, UBS appears to have reached a reasonable good faith conclusion as to Kenney's intended beneficiaries, and made distributions accordingly.  Whether this violated the relevant contracts is a question for the fact finder, but does not itself implicate c. 93A.  See Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995), citing Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-101 (1979) ("a breach of contract alone does not amount to an unfair act or practice under G. L. c. 93A, § 2").  Cf. Anton v. Merrill Lynch, 36 S.W.3d 251, 256 (Tex. Ct. App. 2001) (rejecting challenges to IRA beneficiary redesignation based upon IRA provider's purported failure to comply with its own rules).

half years.  Contrary to the interpretation advanced by
Gillespie's counsel in that letter, see note 7, supra,
Massachusetts courts enforce the statutory directive of G. L.
c. 167D, § 15, that nonprobate transfers shall be made in
accordance with their own contractual terms, even when faced
with a subsequent will provision to the contrary:

> "the Legislature appears to have determined that the policy
> giving effect to testamentary intent should yield to the
> policy of giving prompt and final effect to the beneficiary
> designations in retirement plans."

Fitzpatrick v. Small, 29 Mass. App. Ct. 704, 707 (1991)
(applying earlier version of statute).[23]

It is fair to infer that UBS drafted the contract
provisions that required a writing from Patrick Kenney in a form
meeting UBS approval for a valid change to occur and entitling
UBS to "conclusively rely upon" instructions received from its

---

[23] Incidentally, given the New York choice-of-law provisions
in the CRA and custodial agreement, UBS reasonably may have
expected that New York (rather than Massachusetts) law would
apply to any beneficiary designation challenge.  New York law
also plainly requires that any change of beneficiary designation
with respect to nonprobate assets be made in writing and signed
by the account holder, and further that it be made in accordance
with the rules imposed by the asset's administrator.  N.Y. Est.
Powers & Trusts Law § 13-3.2(e) (McKinney) ("designation of a
beneficiary or payee to receive payment upon death of the person
making the designation . . . must be made in writing and signed
by the person making the designation" and "made in accordance
with the rules prescribed" to govern relevant assets).  New York
law also provides that the beneficiary's ownership rights shall
not be "impaired or defeated by any statute or rule of law
governing the transfer of property by will, gift or intestacy."
N.Y. Est. Powers & Trusts Law § 13-3.2(a) (McKinney).

client.  The parties agree that Gillespie never produced any evidence that Patrick Kenney changed (or even attempted to change) the beneficiary designation in accordance with that provision, and never brought suit.  Still, the pleadings reflect that immediately upon designating the larger IRA "disputed" in late December 2013, UBS decided that its hands were tied due to heightened risk exposure:  it would take no action regarding the larger IRA unless it received a court order or withdrawal of Gillespie's claim, or until all applicable statutes of limitation had expired.

Aliberti has alleged that she was not even notified of any dispute with respect to the larger IRA until nearly three and one-half months after UBS received Gillespie's letter.  Once the existence of a dispute was known to Aliberti, UBS allegedly ignored her requests for additional information about that dispute, even when those requests were made in writing through legal counsel retained for that purpose.  In the amended counterclaim, she further contends that only service of a subpoena succeeded in eliciting any response from UBS.  The perceived unfairness of UBS's policy of inaction with respect to the "disputed" larger IRA was thus exacerbated by its allegedly willful failures to communicate with Aliberti, which required her to retain counsel in order to determine the particulars of

the dispute preventing her from exercising ownership rights to the larger IRA.

The pleadings support that UBS decided it was time to seek the comfort of a court order and file an interpleader complaint in the Superior Court, under the following undisputed circumstances: approximately one year and eight months after Patrick Kenney's death, the larger IRA remained frozen; Aliberti remained the only designated beneficiary; and Gillespie had neither produced evidence to substantiate his claim nor filed suit.  The purpose of interpleader "is to sort out the amounts and priorities of competing claims to a fund."  National Lumber Co. v. Canton Inst. for Savings, 56 Mass. App. Ct. 186, 188 (2002).  UBS's delaying of distribution for more than one and one-half years before filing an interpleader complaint is alleged to have been commercially unreasonable and "unfair" for purposes of c. 93A.

That claim is facially plausible given the supporting allegations of (1) no legitimate competing claim to ownership of the larger IRA in the absence of a writing acceptable to UBS, cf. Equitable Life Assur. Soc'y of the U.S. v. Porter-Englehart, 867 F.2d 79, 89 (1st Cir. 1989) (interpleader inappropriate where no "potentially conflicting claim" to funds at issue exists); and (2) the effective refusal of UBS, during the period between Patrick Kenney's death and its filing of the

interpleader complaint, to communicate with Aliberti about assets that its own records and policies indicated belonged to her -- until she hired counsel and served a subpoena.  See Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc., 68 Mass. App. Ct. 582, 606 (2007) (facts exacerbating unfairness included, inter alia, that "[defendant company's] officers and personnel . . . often took weeks to respond to [plaintiff customer's] inquiries, and sometimes stopped communicating at all, with no adequate or even plausible explanations for their lacks of responsiveness").

Conclusion.  For the reasons stated, we affirm the Superior Court judge's order allowing UBS's motion for judgment on the pleadings with respect to Aliberti's breach of fiduciary duty claim and reverse the order as it relates to Aliberti's claim under G. L. c. 93A.  Accordingly, we remand to the Superior Court for further proceedings consistent with this opinion.

So ordered.