SUPERIOR COURT 
 
 LEGALBRIEFS, INC. v. FOLEY & LARDNER LLP

 
 Docket:
 2484CV01532-C
 
 
 Dates:
 February 25, 2025
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS
 
 

             The case at bar arises out of a contractual dispute between LegalBriefs, Inc. ("LegalBriefs"or the "Plaintiff') and Foley & Lardner LLP ("Foley" or the "Defendant"). The dispute centers on a written agreement pursuant to which LegalBriefs, a legal recruiter, agreed to identify and present lateral partner candidates for potential hire by Foley, an international law firm with a Boston office. Under this agreement, Foley committed to compensate LegalBriefs with a fee for each lateral partner placement successfully referred to the law firm by the recruiter. The contract expressly provides that the placement fee shall be equal to 25% of the partner's projected first-year compensation, subject to a hard cap (or limit) of $500,000 per placement (or group of placements four or fewer in number).
            During the course of a recruitment process culminating in the lateral placement of John/Jane Doe("Doe") into Foley's partner ranks in late March of 2024, LegalBriefs alleges- and Foley denies- that the parties agreed to either modify their governing contract or waive the
 
                                                            -1-
 
fee cap in connection with Doe's hiring by the law firm. LegalBriefs maintains (and, again, Foley denies) that this mutual modification of the contract was intended to bring their 13-year arrangement current and more consistent with prevailing market norms, and thereby allow the recruiter to recover a substantially higher fee when it places a business whale like Doe.
            Presented for decision is Foley's Motion to Dismiss pursuant to Mass. R. Civ. P. l 2(b)(6), by which the law firm seeks the dismissal of all four counts of the Complaint for failure to state a claim upon which relief can be granted. For the reasons which follow, Foley's motion shall be ALLOWED IN PART and DENIED IN PART.
FACTS[1]
            Foley is an international law partnership with a regional office located in Boston, Massachusetts. LegalBriefs is a corporation specializing in the recruitment and placement of legal professionals, and claims "in-depth experience and skill in placing lateral partners at the highest levels of the Boston marketplace.?' Since 2011, Foley and LegalBriefs have enjoyed a positive professional affiliation that has resulted in the hiring of a number of lateral partners and associates into Foley's Boston office.
            For more than 13 years, the parties' relationship with respect to the recruitment and placement of lateral partners has been governed by the terms of a "Fee Agreement for the Hiring of Partners or Groups" (the "Fee Agreement" or the "contract") (Compl. Ex. A.) This written Fee Agreement has remained in effect and unchanged since its original execution in 2011. According
 
--------------------------------------------
 
[1] The following facts are drawn from the Plaintiff's Complaint and Jury Demand and its attached exhibits (the "Complaint") per Mass. R Civ. P. 12(b), see Rafferty v. Merck & Co., 479 Mass. 141, 147 (2018); but the Court has additionally considered other documents that are either matters of public record or were referenced in the pleading to the extent they have been relied upon to frame the Plaintiff's claims. See Galiastro v. Mortgage Elec. Registration Sys.  Inc.. 467 Mass. 160, 173 (2014).
 
                                                            -2-
 
to the Complaint, however, the contract "is outdated and does not reflect the current market rates or payment structures for lateral partners in the industry." (Compl. 18.)
            The unambiguous terms of the Fee Agreement provide that, if Foley employs a "Partner Candidate" as a result of LegalBriefs' referral services,[2] the recruiter shall be entitled to a "Placement Fee" that is "equal to twenty-five percent (25%) of such partner's first year projected salary, exclusive of any bonuses, travel or moving allowances . . . "(Fee Agreement,§ 3.a.) This 25% placement fee, however, is expressly limited by a not-to-exceed fee cap of $500,000 (the "Fee Cap"). The terms of the contract's Fee Cap thus provide in relevant part as follows:
"The Placement Fee payable for any single transaction covered hereby shall not exceed the following[,] regardless of the number of counsel, associate-level attorneys and non-lawyers involved in such transaction:
I.          Five Hundred Thousand Dollars ($500,000) if the trans- action shall include not more than four (4) partner-level attorneys[.]"
            (Id. at§ 3.a.i.)
            In November, 2023, LegalBriefs established a "relationship representing" Doe, a partner at another large law firm who had expressed an openness to leaving that firm if the right opportunity presented itself. (Compl.,r 14.) LegalBriefs then reached out to Susan Pravda, Foley's Chief Strategic Talent Acquisition Partner and the recruiter's primary contact at the law firm, to inquire if Doe might be a good fit for Foley. (Compl.115.)
            On December 14, 2023, certain members of Foley's leadership team held an introductory meeting with Doe. The meeting was evidently successful, and the parties decided to move forward in an effort to broker a deal for Doe to move his/her law practice to Foley. (Compl. ¶¶ 118-20.)
 
--------------------------------------------
 
[2] The contract nowhere recites in detail what these "services" are contemplated to entail beyond the original referral of a qualifying candidate, an ambiguity that necessarily calls upon the Court to interpret the writing for implied and penumbral obligations. See infra.
 
                                                            -3-
 
Doe's practice is alleged to be among the largest books of business of any attorney practicing in Boston, with annual revenues estimated in "the double digit millions of dollars." (Compl. ¶ 19, 21.) According to the Complaint, Foley repeatedly pressed LegalBriefs to ''work its magic" to make a placement of Doe at the law firm happen, "which LegalBriefs did."(Compl. ¶ 21.)
            From December, 2023 through mid-February, 2024, LegalBriefs performed various administrative functions in the representation of Doe regarding his potential placement at Foley, which the Complaint describes as "constant emails, scheduling of meetings, paperwork (ensuring the  Lateral  Partner  Questionnaires  were  completed)  and  counseling  the  prospective lateral partner." (Compl. ,r 23.) LegalBriefs appears to have raised no  concerns about  either the  scope  of the services it was performing or the applicable Fee Cap during this roughly two-month period.
            On or about February 3, 2024, LegalBriefs advised Foley that, because Doe's book of business was so substantial, the law firm should not extend Doe a "low" offer. LegalBriefs explained that Doe would not likely leave his/her current law firm to accept less compensation. In this same connection, LegalBriefs informed Foley that it knew of "at least two other firms interested in [Doe] and would have earned substantially more compensation by placing [Doe] at another of these firms;" but LegalBriefs offered to ''really push for" Foley if the law firm made the right kind of economic offer. (Compl.,¶ 24.) [3]
 
--------------------------------------------
 
[3] It is unclear to the undersigned exactly what LegalBriefs was attempting to communicate to Foley by this statement. Encouraging the law firm not to "low-ball" a candidate who is apt to have other interested suitors is obviously unexceptional, as is pointing out that LegalBriefs was already aware of two other law firms that had attempted to recruit Doe. What is much less clear is whether the "substantially more compensation" at these other firms that Doe might be willing to spurn refers to Doe's compensation as a lawyer or LegalBriefs' as a recruiter. It is likewise unclear whether LegalBriefs is suggesting that it would ''push for''Foley as the law firm where Doe transferred laterally for any reason other what is in the best interests of the candidate whom this recruiter represented. Each of these ambiguities, and LegalBriefs' potential conflicts of interest, would come into sh31per relief in the weeks ahead. See infra.
 
                                                            -4-
 
            On or about February 12, 2024, before any agreement was struck between Doe and Foley, LegalBriefs for the first time initiated a discussion about the Fee Cap with Foley's Susan Pravda (Compl.¶ 26.) The following day, February 13, LegalBriefs transmitted an email to Foley, "stating that it was not going to accept any fee cap for [Doe's] placement and that any such cap should be waived." (Compl. ¶ 27.) The Complaint alleges that "Foley understood that [LegalBriefs] was seeking either a 'waiver' or a 'modification' to the Fee Agreement with regards to the $500,000 fee cap." (Compl. ¶ 27.) The Complaint further alleges that "Foley understood that the Fee Agreement needed to be modified given that this was the first time in Foley and LegalBriefs' working relationship that an attorney's projected salary rendered the purported fee cap woefully insufficient." (Compl., ¶ 29.) [4] Despite this claimed insistence that the Fee Agreement be modified or its Fee Cap waived, however, the Complaint contains no allegation that anyone at  Foley ever agreed to this request or otherwise communicated that it would be granted.
            Two days later, on February 15, 2024, LegalBriefs "reminded" Foley that the Fee Cap embodied  in the parties' "outdated" Fee Agreement was "unacceptable  in light of [Doe's] likely salary." (Compl.¶ 31.) Although LegalBriefs cited no fresh consideration that would support such a change in the parties'  still valid contract -   either then or now-Foley's Susan Pravda responded by email to LegalBriefs' "clear demand for modification or waiver of  the fee  cap" by stating that she was checking." (Compl. ¶ 32.) The Complaint alleges that this temporizing assurance was false; that "Pravda was not in fact checking with anyone;" and that at no time did Pravda inform
 
--------------------------------------------
 
[4] The Court is puzzled by this assertion from LegalBriefs as well. Aside from imputing to Foley an ''understanding" without identifying any evidential facts to support the same, the substance of the attribution is patently illogical. The unmistakable purpose of the Fee Cap was to protect the law firm from having to pay an inordinately large fee for a placement who happens to command frothy first-year compensation. Unlike the compensated lawyer himself, the recruiter does not "do" anything more to earn its fee when the lateral partner happens to carry a jumbo book of business. It is surely not the Fee Cap that has to be tested for sufficiency or insufficiency, because the purpose of the cap is to guard against excessive fee-taking by the recruiter. The hiring of an extra-large earner like Doe would seem to present the very paradigm when Foley would expect the Fee Cap to be enforced, not waived.
 
                                                            -5-
 
the management of Foley ... that LegalBriefs' request should be considered as a condition of hiring Doe." (Compl. ¶ 32.)
            The Complaint next alleges that, "by the time of the February 15, 2024 email exchange between LegalBriefs and Pravda (wherein LegalBriefs repeated that it would not accept the purported fee cap), it was evident that Foley had no intention of agreeing to LegalBriefs' demand to waive or modify the Fee Agreement's fee cap provision." (Compl. 33.) Despite Foley's failure to accede to LegalBriefs' demanded surrender of the law firm's contractual right to the Fee Cap, the Complaint alleges that Foley continued to "require LegalBriefs to make significant efforts" to "ensure that [Doe] joined Foley and not another law firm." (Compl. 34.)[5]
            On February 21, 2024, LegalBriefs renewed its position that that it should not be deemed subject to any contractual limitation on its placement fee for Doe. Plaintiff even alleges that it communicated to Foley that it had "negated another firm from Doe's consideration under the presumption that Foley & Lardner will waive the cap on the placement fee." (Compl. ¶ 35.) [6]
 
--------------------------------------------
 
[5] The Complaint does not specify what these"significant efforts" entailed, or in what manner the routine administrative tasks that are alleged Compl. ¶ 23) can be considered "beyond the scope of LegalBriefs' services." To all appearances, LegalBriefs' Complaint criticizes Foley for insisting that the recruiter perform the very same kinds of logistical functions it always had under the parties' contract, an insistence somehow rendered objectionable by the law firm's refusal to pay nearly twice the fee for such services prescribed by the controlling Fee Agreement. LegalBriefs' grievance at being called upon to answer emails, schedule meetings, and the like is the more curious when one recalls that this recruiter had every incentive to see Doe placed at a law firm - like Foley- with which it had a contractual relationship that would entitle it to a half-million dollar placement fee. LegalBriefs' bustling to see Doe placed at Foley was undeniably in its financial self-interest; for slow-walking Doe by being less responsive to Foley's demands for information and meetings carried the real risk to LegalBriefs that Doe might either stay put, sign with a non-client law firm (entitling the recruiter to no fee at all), or terminate the recruiter relationship altogether.
[6] The Complaint furnishes no explanation for what appears to the undersigned to be a clear conflict of interest - a recruiter seeming to prioritize its own interest in a placement fee ahead of the career interests of the candidate whom it represents. Construing this allegation of the Complaint in the light most generous (and least damning) to LegalBriefs, the Court infers that this extraordinary salvo represented an attempt by LegalBriefs to lead Foley to believe that it had some kind of special influence over the decision-making of Doe regarding law firm selection. Implausible though such a suggestion would seem, it might incline Foley to give more favorable consideration to LegalBriefs' demand that it give up the Fee Cap.
 
                                                            -6-
 
            The Complaint alleges that, over the next month, LegalBriefs continued to perform work under the Fee Agreement, and Foley continued to accept these services as the parties moved closer to a lateral hiring of Doe. (Compl. ¶¶ 36-37.) At no time, however, does the Complaint allege that Foley ever agreed to waive or modify the contract's Fee Cap. The Complaint instead accuses Foley of making 'pretextual excuses' for the law firm's failure (to that point) to respond in writing to LegalBriefs' continuing demand that the Fee Cap be adjusted or abandoned. It cites as one example of such excuse-making an email communication from Foley's Director of Legal Recruiting, Amy Moynihan, in which Ms. Moynihan apologizes for the law firm's delay: "Over the past several weeks, we have been deeply immersed in our partner compensation process, making it challenging to engage in a productive dialogue with our firm leadership regarding the cap on [Doe's] placement fee." (Compl. ¶42.) Yet, oddly, the Complaint omits to mention an earlier (February 21) communication from Ms. Moynihan to LegalBriefs in the same email thread (so it could not have been overlooked when this pleading was drafted) in which Foley asserts its position regarding the status of the requested Fee Cap waiver: "I wanted to let you know that your request to waive the fee cap for [Doe's] placement fee is under review by firm leadership. We hope to have an answer to you soon and appreciate your patience." (Def.'s Ex. 1, Breese Aff., Moynihan email dated Feb. 21, 2024.) Thus, as of February 21, 2024, Foley made clear to LegalBriefs that it had not agreed to modify the Fee Agreement or waive its Fee Cap, but that the matter was still under consideration. 
            Notwithstanding Foley's February 21 assertion that the law firm had not agreed to forbear from enforcement of the contract's FeeCap, and that LegalBriefs' request that the cap be modified or waived was only under consideration by firm leadership, LegalBriefs continued to assist in the process which culminated in Doe's hiring by Foley in or around March 22, 2024. LegalBriefs now
 
                                                            -7-
 
maintains that Foley's acceptance of these services, together with its hiring of Doe, reflect an
"understanding" that the Fee Cap had been waived.
            On March 25,2024, Foley transmitted a letter by email to LegalBriefs. In this letter, which issued under the signature of Amy Moynihan, Foley stated that, while it held a "deep appreciation for [its] partnership with LegalBriefs" and "hope[d] to continue a successful working relationship in the future," the law firm"expects the terms of the fee agreement in place at the time a candidate is presented to be honored." The letter continued that "[t]his is the expectation for all search firms with whom we have agreements," and that, for this reason, Foley "cannot waive or modify the fee cap for [Doe's] placement." (Compl. ¶ 39; Def 's Ex. I -Moynihan email dated Mar. 25, 2024.)
            Foley paid LegalBriefs $500,000 in respect of the Doe placement. This amount represents what the parties agree was due to the recruiter under an unmodified Fee Agreement, but$375,000 less than a 25% placement fee would have yielded LegalBriefs had the fee not been capped per the terms of the Fee Agreement. The present litigation followed in due course.
DISCUSSION
            Plaintiff LegalBriefs has brought a four-count lawsuit against Foley, each claim reflecting the contention that this legal recruiter is entitled to a 25% placement fee (or its proxy) that is not capped by the Fee Agreement's express $500,000 limitation. More specifically,[7] in Count ID of the Complaint, Plaintiff maintains that, by its conduct, Foley manifested assent to LegalBriefs' demanded modification or waiver of the Fee Agreement's Fee Cap, thereby effecting a contract change and bringing Foley's payment of a capped placement fee into breach of the agreement. LegalBriefs seeks damages measured by the $375,000 difference between 25% of Doe's first-year partner compensation and the capped placement fee it was actually paid by Foley. (Compl.
 
--------------------------------------------
 
[7] The Court will address these claims in the logical way they nest as a legal matter, rather than in the sequence they appear in the Complaint.
 
                                                            -8-
 
¶¶ 66-70.) In Count II of the Complaint, Plaintiff demands that it be compensated for services it provided to Foley that ''went beyond the scope of the Fee Agreement," arguing that the recruiter is entitled to a "restitutionary remedy" under a quasi-contract/unjust enrichment theory. (Compl. ¶¶ 5 8-61.) In Count IV of the Complaint, Plaintiff asserts a claim for violation of the implied covenant of good faith and fair dealing, premised on the allegation that Foley frustrated its reasonable expectation of receiving the fruits of its contract- namely, an uncapped 25% of Doe's first-year partnership compensation at the law firm. Finally, in Count I of the Complaint, Plaintiff alleges that Foley committed an unfair and deceptive business practice, in violation of G.L. c. 93A, § 11. LegalBriefs rests this claim on the contention that Foley "strung it along" with false assurances about its potential willingness to modify or waive the Fee Cap, all the while pressing this recruiter to work extra-diligently,"push for Foley," and thereby help bring about a hiring deal with Doe. LegalBriefs maintains that, in reliance on Foley's false statements and misleading conduct, it expended efforts to facilitate the placement of Doe at this law firm that it otherwise would not have. These claims shall be addressed in turn.
            I. LEGAL STANDARD
            To survive a motion to dismiss under Mass. R. Civ. P. 12(b)(6), a complaint must allege facts ''plausibly suggesting ... entitlement.to relief[.]" Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007). Detailed factual allegations are not required, but the plaintiff must present more than mere "labels and conclusions," such that the alleged facts "raise a right to relief above the speculative level." Iannacchino, 451 Mass. at 636, quoting Twombly. 550 U.S. at 555. In determining whether a complaint meets this standard, the Court accepts the factual allegations in the complaint as true, and all draws reasonable inferences in favor of the non-moving plaintiff. Harrington v. Costello,
 
                                                            -9-
 
467 Mass. 720, 724 (2014).
            In considering a motion to dismiss, the Court is generally limited to the four corners of the complaint. There are exceptions to this general rule. The Court may consider ''matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" without converting the motion to one for summary judgment. Reliance Ins. Co. v. Boston, 71 Mass. App. Ct. 550, 555 (2008), quoting Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000). The Court may also consider documents not attached to the Complaint, but upon which the Plaintiff relied in framing the claims therein. Goldin v. Liberty Mut. Ins. Co. 460 Mass. 222, 224 (2011).
            II. ANALYSIS
                        A. BREACH OF CONTRACT
            There can be no question but that the Fee Agreement is clear in its language, imposing a $500,000 cap on the fee that LegalBriefs could earn in connection with the placement of Doe at Foley. Where, as here, contract language is unambiguous, it must be construed and enforced according to its plain meaning. Lieber v. President & Fellows of Harvard Coll., 488 Mass. 816, 823 (2022). Plaintiff has not contested that the parties' contract, as written, imposes a Fee Cap that forecloses a breach claim in which it seeks compensation for Doe's placement in excess of the $500,000 it was paid by Foley[8].
            Plaintiffs claim for breach of contract instead posits that LegalBriefs and Foley reached an agreed understanding to either modify the Fee Agreement, or waive enforcement of its Fee Cap in the case of Doe's placement. (Compl. ,, 66-68.) Parties may, of course, modify contracts;
 
--------------------------------------------
 
8 The Court does not find this concession in any meaningful way undermined by LegalBriefs• occasional use of the qualifying vocabulary "purported" to describe the contract's Fee Cap. This is a lawyerly affectation rather than substantive argument, and does not negate the unambiguous terms of the Fee Agreement.
 
                                                            -10-
 
but "[a] valid contract modification requires mutual assent and consideration."Okerman v. VA Software Corp., 69 Mass. App. Ct. 771, 781 (2007). Accord Sea Breeze Estates, LLC v. Taverna, 94 Mass. App. Ct. 210, 216-17 (2018). In this regard, the modification of "contracts rest on objectively expressed manifestations of intent," Beatty v. NP Corp. 31 Mass. App. Ct. 606,612 (1991), and "not subjective expectations" held by one rather than both parties. Pahlavi v. Palandjian, 809 F.2d 938,945 (1st Cir. 1987). Accord Duff v. McKay. 89 Mass. App. Ct. 538,
544 n.14 (2016).
            In the case at bar, Plaintiffs Complaint makes clear that LegalBriefs and Foley never reached any mutual accord to modify their Fee Agreement. The most the Complaint alleges is that LegalBriefs requested a contract modification that would waive the agreement's Fee Cap on February 13, and then reminded Foley of its objection to this limitation on February 15 and again on February 21. Nowhere, however, does the Complaint allege that Foley ever agreed- orally or in writing-to this proposed modification of the parties' longstanding Fee Agreement. Absent such indications of mutually manifested agreement, there was no effective contract modification and the contract must stand as written. See Sea Breeze Estates, 94 Mass. App. Ct. at 215; Situation Mgmt. Sys. v. Malouf. 430 Mass. 875, 878 (2000).[9]
            In the alternative, Plaintiff insists that. by its course of conduct, Foley assented to LegalBriefs' proposed modification to the Fee Agreement or a waiver of its Fee Cap as to the
 
--------------------------------------------
 
[9] The Complaint itself acknowledges that, as of February 15, it bad become "evident that Foley had no intention of agreeing to LegalBriefs' demand to waive or modify the Fee Agreement's fee cap provision." (Compl.¶33.) It is difficult to fathom how LegalBriefs can maintain that the parties reached a mutual accord to modify the Fee Agreement in light of this admission, and that the recruiter only continued to work to bring about Doe's lateral placement at Foley in the reasonable expectation that its fee would not be capped per the terms of the contract.
These contentions stand in irreconcilable conflict.
 
                                                            -11-
 
placement of Doe. (Compl.¶¶66-68.) This is plainly not th case.[10] It is of course true, as Plaintiff argues, that a party to a contract may, by its conduct, communicate to a counter-party an intent to agree to a proposed modification or waiver, and that bona fide disputes as to whether particular conduct in fact reasonably conveyed such intent are for the jury. (See Pl.'s Memo, at pp. 7-8 (citing cases).) It is further undisputed that a party's assent to a proposed contract modification may, in limited circumstances, be inferred from silence and other passive conduct. See, ct.&, Hanna v. Shay, 73 Mass. App. Ct. 1115, 2009 WL 113405, at *2 (2009) (Rule 1:28); Bump v. Robbins. 24 Mass. App. Ct. 296,305 (1987).
            In the present case, however, there is no conduct by Foley - active or passive -that could reasonably be construed as assent to LegalBriefs' proposed modification to the Fee Agreement. All that the Complaint alleges in this regard is that, in the face of a repeatedly pressed demand for modification or waiver of the Fee Cap, "Foley continued to require that LegalBriefs make efforts on its behalf with regard to Doe," and "continued to expect and did require LegalBriefs to make significant efforts ... to ensure that [Doe] joined Foley and not another law firm." (Compl. ¶¶ 30, 32.) Relatedly, the Complaint alleges that, following LegalBriefs' initial February 12 demand for a change to the Fee Agreement, "LegalBriefs continued for the next four weeks to ensure that [Doe] would join Foley . . . " (Compl.¶ 37.) The glaring flaw in the argument that Foley must, therefore, be deemed to have assented or agreed to LegalBriefs' proposed contract modification is that the work LegalBriefs performed and the services Foley accepted were already implicit requirements of the parties' existing contract. Foley cannot fairly be inferred to
--------------------------------------------
 
[10] Indeed, even the imprecision in the changed deal to which Foley purportedly assented reflects an absence of definite agreement to all material terms. LegalBriefs was proposing either a modification to the 2011 Fee Agreement such as would govern all of the  parties'  lateral partner placements going forward,  or  a  more  limited  waiver of  the Fee Cap that would apply strictly to the pending hire of Doe. The difference between the two alternatives is obviously material, and LegalBriefs' continued insistence that Foley- an organization of lawyers - somehow agreed to both betrays the reality that it in fact agreed to neither.
 
                                                            -12-
 
have assented to a modified agreement by doing no more than require and accept the services to which it was already contractually entitled. See R&R Chemicals, LLC. v. Cellect, LLC., No. C.A. 01-11623-PBS, 2002 WL 2018725, at *5 (D. Mass. Aug. 29, 2002) (conduct consistent with terms of original written agreement is not evidence of implied assent to modification), citing Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 47 (1991).
            Although the Complaint repeatedly alleges that LegalBriefs' services in support of the Doe placement "went well beyond those which are contained in the Fee Agreement" (Compl. ¶ 22),[11] the Court rejects this facially unreasonable construction of the contract. It is the responsibility of the Court, and not the jury, to interpret the meaning of a contract - that is, to determine what the instrument does and does not require of the parties thereto. See Balles v. Babcock Power Inc., 476 Mass. 565, 572 (2017); Freelander v. G. & K. Realty Corp., 357 Mass. 512,516 (1970). As a matter of law, and basic common sense, the Court here determines that the Fee Agreement obligated LegalBriefs not merely to refer qualified lateral partner candidates to Foley on a confidential basis (see Fee Agreement, § 2), but impliedly called upon the recruiter to process any referral by acting as a responsible intermediating representative of the candidate. This would naturally include responding to emails and calls, scheduling meetings, assisting the candidate with responding to the Jaw firm's Lateral Partner Questionnaire, and the like, which are the only "extra-contractual"services LegalBriefs claims to have performed in this case. These are, therefore, irrefutably not services that fall outside the purview of the parties' existing contract. They are, rather, the sort of routine administrative and logistical functions that any
 
--------------------------------------------
 
[11] See also Compl. ¶ 30("Again, these efforts went beyond Section 2 of the Fee Agreement'');¶ 34 ("Foley continued to expect and did require LegalBriefs to make significant efforts (and ones that went beyond the stated scope of LegalBriefs' services) to ensure that [Doe] joined Foley and not another law firm");¶ 36 ("With Foley ... knowing that LegalBriefs was continuing to perform work beyond the Fee Agreement, Foley continued to expect LegalBriefs to work on its behalf . . . ").
 
                                                            -13-
 
recruiting firm would carry out when presenting a candidate to a law firm. Simply put, the Complaint does not allege facts plausibly suggesting that LegalBriefs performed services to facilitate Doe's transfer to Foley beyond those inherently contemplated by the Fee Agreement and performed by legal recruiters as a matter of course. See Starr v. Fordham, 420 Mass. 178, 190 (1995) (scope of performance per contract must be construed "with reference to the situation of the parties when they made it and to the objects sought to be accomplished"); Shayeb v. Holland, 321 Mass. 429, 431 (1947) (performance may require duties not explicitly delineated in contract but reasonably necessary to attain contract's object). Identifying a practitioner who meets the law firm's stated qualifications requirements for a lateral partner, counseling the candidate, assisting in the assembly of practice information (such as existing clients, hourly rates charged, historical revenues, etc.), answering inquiries by phone and email, setting up meetings, and the like are nowhere set forth expressly as services falling within the scope of the Fee Agreement. But these administrative tasks are undeniably how a recruiter earns its (substantial) placement fee; and it is specious to suggest that LegalBriefs could have demanded more money from Foley for performing such contractually implied services. See Aggregate Indus. NE. Region, Inc. v. Massachusetts Paving. Inc., No. 052715, 2006 WL 446104, at *2 (Mass. Super. Feb. I, 2006) (MacLeod-Mancuso. J.) (no obligation to pay additional sum for performance already owed), citing Swartz v. Lieberman, 323 Mass, 109, 112 (1948); Parrot v. Mexican Cent. Ry. Co., 207 Mass. 184, 194 (1911).[12]
 
--------------------------------------------
 
[12] The Complaint nowhere alleges that LegalBriefs ever communicated to Foley that it believed it was performing services that somehow fell beyond the scope of their Fee Agreement such as would entitle the recruiter to either an uncapped placement fee or some other type of additional compensation. It hardly strains the imagination to think how Foley would have reacted to a demand that LegalBriefs receive more money simply for answering emails and calls, assisting in the completion of candidate paperwork, scheduling interviews, and the like, on the ground that those tasks are not spelled out explicitly in the Fee Agreement. In all events, this Court construes the parties' contract to determine that all of these tasks are duties implied under the parties' Fee Agreement. In these circumstances, the Court has serious doubts that the" additional" work LegalBriefs alleges it performed in
 
                                                            -14-
 
            Given that LegalBriefs was doing no more than what its existing Fee Agreement with Foley contemplated, and what was obviously in the recruiter's own self-interest to do (viz., work assiduously to try to place Doe with Foley as a lateral partner and thereby earn a six-figure placement fee), there is no basis in logic or law to construe the law firm's silent acceptance of LegalBriefs' services as an agreement to modify evidenced by conduct. See Sea Breeze Estates, 94 Mass. App. Ct. at 218 (conduct and attendant circumstances did not reflect that party agreed, or even intended to agree, to modify contract), citing Cambridge port Sav. Bank v. Boersner, 413 Mass. 432,439 n.10 (1992).
            Even if silence by Foley in the face of LegalBriefs' demands could somehow be fairly interpreted to have conveyed assent to such demands, and it cannot, the Court is compelled to point out that Plaintiff's own Complaint concedes that Foley was not silent when confronted with the recruiter's demands. Not only did the law firm not agree to modify the Fee Agreement or waive its Fee Cap for the Doe placement; and not only did the law firm not engage in any other conduct that could reasonably be construed as evincing agreement to the requested contract change; but Foley was anything but silent in response to LegalBriefs' demands.[13] To the precise contrary, Foley's Susan Pravda replied to LegalBriefs' initial (mid-February) demand for a
 
--------------------------------------------
 
connection with the Doe placement could qualify as valid consideration for the contract modification it was demanding from Foley. To agree to do(or refrain from withholding) what one is already obligated to do cannot supply consideration for a material contract modification. See Boston Pro. Hockey Ass'n v. Commissioner of Revenue 443 Mass. 276, 287 (2005) ("We have long held that 'performance of an existing legal duty or contractual obligation is not sufficient consideration for a new promise by the obligee."'), quoting Sloan v. Burrows. 357 Mass. 412,415 (1970); accord 323 Mass. at 112.
[13] Once again, LegalBriefs was not insisting to Foley that it be paid more for the Doe placement because it supposedly entailed additional work. That is, LegalBriefs never maintained that it was entitled to a larger fee asa matter of right because the services it was performing were somehow different in kind from the ones it had agreed to perform in the Fee Agreement. LegalBriefs was instead advocating an appeal to fairness - viz.. that the existing contract was "outdated," and that its $500,000 fee cap for placement of a partner with a book of business as large as Doe's rendered the fee"woefully insufficient." (Compl.¶ 29.) Thus, LegalBriefs was demanding a material change to the contract, something it clearly reorganized Foley enjoyed the prerogative to accept or reject in its discretion. How Foley chose to respond to LegalBriefs' requests must be understood in this context.
 
                                                            -15-
 
contract modification or Fee Cap waiver by stating that she was"checking." Likewise, when Foley had still not provided a response to this demand by February 21, less than one week later, the law firm's Director of Legal Recruiting transmitted an email to the recruiter in which she stated explicitly that LegalBriefs' "request to waive the fee cap for [Doe's] placement fee is under review by firm leadership."
            The foregoing communications leave no room for doubt that the parties understood that LegalBriefs' proposed contract modification/fee cap waiver was in the nature of a request; that this request had not been agreed to by Foley; but that the matter was "under review" by the law firm's leadership. There are no further communications between the parties regarding the Fee Agreement alleged in the Complaint or set forth in the attached exhibits; and, in these circumstances, the ensuing four weeks in which LegalBriefs provided and Foley accepted administrative services in support of the Doe placement cannot be deemed to have been on the understanding that the parties had mutually agreed to modify their Fee Agreement. LegalBriefs may have continued working in the hope that, with its pressing, Foley would agree to renegotiate the terms of their contract. But that is far cry from asserting, as the Complaint does without basis, that these parties actually came to an agreement for an uncapped placement fee. There is no other rational conclusion to be drawn from the Complaint, and Plaintiffs breach of contract claim (Count III) thus fails as a matter of law.
            B. QUASI-CONTRACT/UNJUST ENRICHMENT
            In Count II of the Complaint, Plaintiff alleges that it is entitled to an unspecified restitutionary remedy, arising from LegalBriefs' supposed provision of services to Foley that were "beyond the scope" of the Fee Agreement. The gravamen of this claim, once again, is that LegalBriefs fulfilled various administrative tasks required by Foley in support of the Doe
 
                                                            -16-
 
placement (answering calls and emails, scheduling meetings, facilitating the completion of paperwork, and the like), and that these tasks exceeded the scope of services recited in Section 2 of the contract. LegalBriefs thus claims a right in quasi-contract to additional compensation that it reasonably expected, and argues that it would amount to "unjust enrichment" to allow Foley to retain the benefits of such services without paying for them. (Compl.¶¶58-61.) The Court finds this claim to be lacking in merit.
            As a threshold matter, it is well settled that common law courts will not allow claims for quasi-contract, quantum meruit or unjust enrichment to lie where the parties have entered into a valid and enforceable contract that defines their respective rights and obligations. See Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623,641 (2013) ("It is well settled that a [quasi- contract] claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties."). Accord Boston Med. Ctr. Corp. v. Secretary of Exec. Off. of Health and Human Servs., 468 Mass. 447,467 (2012). The Court acknowledges that LegalBriefs was entitled to plead claims in the alternative, see Mass. R. Civ. P. 8(a), (e)(2), and that it is common practice to pursue breach of contract and unjust enrichment theories concurrently. See Chang v. Winklevoss, 95 Mass. App. Ct. 202,211 (2019). But this does not change the fact that, where a valid contract clearly and comprehensively covers the subject matter of a particular claim, a plaintiff may neither recover duplicative remedies nor assert equitable rights in contradiction to the dictates of the contract. See Shaulis v. Nordstrom. Inc.• 865 F.3d 1, 16 (1st Cir. 2017) ("Massachusetts law does not permit litigants to override an express contract by arguing unjust enrichment"); Boswell v. Zephyr Lines. Inc., 414 Mass. 241,250 (1993) (valid contract covering subject matter of dispute forecloses recovery in quantum meruit).
            In the case at bar, the Fee Agreement thoroughly addresses the terms and conditions
 
                                                            -17-
 
under which Legal Briefs can receive a placement fee for the hiring of a lateral partner by Foley. That the contract sets a financial ceiling on the amount of such fee that LegalBriefs finds objectionable furnishes no ground for the assertion of equitable claims intended to circumvent the cap. See supra.
            Even if Plaintiff could properly assert a quasi-contract/unjust enrichment claim at the same time it seeks enforcement of the Fee Agreement, and it cannot in these circumstances. LegalBriefs' theory of recovery in all events fails as a matter of law. "Unjust enrichment is defined as the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Shea v. Cameron, 92 Mass. App. Ct. 731, 740 (2018), quoting Santagate v. Tower, 64 Mass. App. Ct. 324,329 (2005). To achieve a recovery upon the
theory of unjust enrichment, "the plaintiff must prove (I) that it conferred a measurable benefit upon the defendant[];(2) that the plaintiff reasonably expected compensation from the defendant[];and (3) the defendant[]accepted the benefit with the knowledge, actual or chargeable, of the [plaintiffs] reasonable expectations." Finard & Co. v. Sitt Asset Mgmt., 79 Mass. App. Ct. 226,229 (2011). At its core, Plaintiff's quasi-contract/unjust enrichment claim in this case argues that the services it furnished to Foley in connection with the Doe placement exceeded its contractual obligations, gave rise to a reasonable expectation that it would be paid more than $500,000 for such services, and that Foley's retention of the benefit of such services entitles it to a restitutionary remedy. (Pl.'s Memo., at pp. 16-17.) This is plainly not so.
            The Fee Agreement made clear that LegalBriefs' fee for the lateral placement of Doe would under no circumstances exceed $500,000. LegalBriefs nonetheless made numerous demands for the contract's Fee Cap to be modified or waived, but Foley never agreed. Whatever benefit LegalBriefs' continuing services might have conferred upon Foley in these circumstances
 
                                                            -18-
 
(and it is doubtful that answering phone calls, responding to emails, and scheduling meetings could fairly be considered "measurable" as benefits go), LegalBriefs cannot have entertained a ''reasonable expectation" that it would be paid additional compensation for such services. These services were not "beyond the scope" of the parties' contract, see ante, and LegalBriefs cannot rationally have held the belief that it would be independently paid for them absent some entirely new agreement with Foley. This, of course, is precisely why LegalBriefs repeatedly pressed its demand for an agreed change to the contract. When Foley refused to accede to such a change, however, LegalBriefs continued to provide services to support the Doe placement- not because it could reasonably anticipate additional payment for same, but because such services were integral to completing Doe's lateral transfer so that the recruiter would be entitled to a $500,000 fee.[14] LegalBriefs earned and was paid that fee, and Foley retained no unjust enrichment when it
declined to be held up for more.
            For each of these reasons, Plaintiff's claim for an equitable quasi-contract/unjust enrichment recovery (Count II) fails as·a matter of law.
            C. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
            In Count IV of the Complaint, Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing. This claim rests upon the contention that, by enforcing the Fee
 
--------------------------------------------
 
[14] Had LegalBriefs stopped communicating with Foley after making its initial referral and presentation of Doe in December of 2023, had it refused to help schedule meetings, or had it disappeared altogether for three months and not assisted the candidate in furnishing the law firm with the practice information it required, it is doubtful that Doe would have been hired at all. And, even if he had been, there is substantial reason to doubt that Foley would have considered an AWOL recruiter entitled to a placement fee. This is surely why LegalBriefs kept working toward Doe's placement at Foley. It is wholly unremarkable that a realtor listing a marquis piece of real estate, or a sports agent representing an unsigned all-star, or a trial attorney working on a contingency fee basis in a large class action will devote more time and energy, incur greater out-of-pocket expense, and generally prioritize or "go the extra mile" in such matters because of the potentially greater reward at stake. This is precisely the paradigm the Complaint alleges. Absent specific agreement to the contrary, the extra work undertaken to place a heavy-hitter like Doe is already baked into the economics of the parties' contingent fee contract (greater potential reward justifying greater invested effort), and is not a basis for demanding additional compensation.
 
                                                            -19-
 
Agreement's $500,000 Fee Cap, Foley "destroyed LegalBriefs' reasonable expectations to receive the fruits of the contract; namely, 25% of [Doe's] first year projected salary."(Compl.¶ 74.) This claim, too, lacks merit as a matter of law.
            "Every contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451,471 (1991), quoting Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354,362 n.9 (1990). "The implied covenant of good faith and fair dealing ... provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, 411 Mass. at 471(quotation omitted, modification in original). The implied covenant, however, cannot "create rights or duties beyond those agreed to." Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287(2007). Accord Robert & Ardis James Found. v. Meyers. 474 Mass. 181, 191 (2016){same); Ayash v. Dana Farber Cancer Inst., 443 Mass. 367, 385 (2005) ("The scope of the covenant is only as broad as the contract that governs the particular relationship."). Rather, "the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2011). In this regard, the implied covenant will give rise to a cause of action against a party who, independent of a contract breach, engages in bad faith and unfair dealing for the purpose of denying its contracting counter-party the intended benefits of their bargain. See Nagel v. Provident Mut. Life Ins. Co. 51 Mass. App. Ct. 763, 768-69 (2000). Accord Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212,226 (D. Mass. 2005) ("recovery under the implied covenant requires conduct taken in bad faith to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage").
 
                                                            -20-
 
`In the case at bar, it is plain that the facts pleaded give rise to no viable claim for violation of the implied covenant of good faith and fair dealing. LegalBriefs seeks in this claim not to ensure Foley's fulfillment of the agreed-upon terms of the Fee Agreement, but instead to impose entirely new terms -the striking of a long-standing Fee Cap - to which Foley was unwilling to agree. Foley's actions in no sense circumvented its obligations under the Fee Agreement but, to the contrary, honored such obligations in precisely the manner the parties at all times understood. [15]
            The allegations of the Complaint make plain that LegalBriefs suffered no frustration of any reasonable expectation that it would be paid more money for Doe's placement at Foley than it was. Foley paid LegalBriefs what the Fee Agreement required, $500,000, and no more is owed. Count IV of the Complaint thus fails to state a claim and must be dismissed.
            D.        UNFAIR AND DECEPTIVE BUSINESS PRACTICES UNDER MASS. G.L. CHAPTER 93A
            In Count I of the Complaint, Plaintiff presses a claim for unfair and deceptive business practices in violation of G.L. c. 93A, § 11. The theory which grounds this claim is that Foley "strung LegalBriefs along," calling upon the recruiter to continue providing services in support of the Doe placement even as the law firm knew LegalBriefs was hoping and demanding to receive more money through a modification or waiver of their contract's Fee Cap. (Compl. ¶¶ 47-51.)
            This claim presents a closer question in the precincts of Rule 12. The Complaint alleges,
 
--------------------------------------------
 
[15] To the undersigned, the only party that appears to have flirted with a violation of good faith and fair dealing is LegalBriefs. It was LegalBriefs that demanded that clear and unambiguous provisions of the Fee Agreement be scrapped. It was LegalBriefs that contrived supposedly additional services "beyond the scope" of the contract in an attempt to extract money not owed to it under that contract. And it was LegalBriefs that suggested (at least to the Court) that it might have steered Doe to another law firm so that it could collect a higher placement fee had it known that Foley intended to stand on its rights to the Fee Cap. LegalBriefs' accusation of bad faith and unfair dealing on the part of Foley calls to mind Raymond Chandler's memorable remark: "When you point a finger, there are three fingers pointing back at you."
 
                                                            -21-
 
in substance, that over a five-week period between February 12 and March 22, 2024, LegalBriefs repeatedly pressed Foley to relinquish its contractual right to a Fee Cap in connection with Doe's placement. In response, a Foley partner represented to LegalBriefs on February 15 that she was "checking" on the request. Approximately one week later, on February 21, Foley's Director of Legal Recruiting responded in writing to a renewed demand for a Fee Cap waiver from LegalBriefs by stating that the matter was still ''under review by firm leadership" and that she "hoped to have an answer to [LegalBriefs] soon." From this point forward, the Complaint does not recite that the parties engaged in any further discussion of the Fee Cap; but it is LegalBriefs' contention that, in reliance upon the assurances that Foley was giving its request for a contract modification or Fee Cap waiver serious consideration, the recruiter provided the law firm an especially assiduous level of service and support. LegalBriefs learned to its dismay, within just three days of Doe's separation from his law firm to join Foley in late March, 2024, that the law firm would be holding the recruiter to their contract's explicit $500,000 Fee Cap.
            Numerous cases applying Chapter 93A have held that one company "stringing another along" with false representations as to its intentions can qualify as an ''unfair and deceptive business practice" that is actionable under the statute. See, e.g. H1 Lincoln. Inc. v. S. Washington St.. LLC. 489 Mass. I, 16(2022) ("string along claim" entails "protracted pattern of conduct" that fraudulently misrepresents ''true situation ... thereby inducing detrimental reliance on the target's part''); Connor v. Marriott Int'l. Inc., 103 Mass. App. Ct. 828, 835 (2024) (hotel strung plaintiffs along for weeks, accepting reservations even as it knew "all the time ... that the hotel would upend the plaintiffs' plans and disrupt their business as soon as they arrived"). See also Full Spectrum Software. Inc. v. Forte Automation Sys. Inc., 858 F.3d 666,672 (1st Cir. 2017) ("one business•s stringing along of another to the other's detriment can satisfy [the]
 
                                                            -22-
 
stricter standard" of unfair and deceptive conduct that applies to businesses under Chapter 93A; affirming c. 93A liability against defendant that directed plaintiff to continue working for 28 days before informing plaintiff it would not agree to additional conditions and then disclaiming work orders).
            The facts of the present case, generously construed in the light most favorable to LegalBriefs, would appear to state a viable "stringing along" claim under Chapter 93A. Even if Foley was under no obligation to, and did not, accede to LegalBriefs' demand as a contractual matter, and even if there is no reasonable basis for LegalBriefs to claim that it relied on an expectation that Foley would be un-capping the Fee Agreement's recruiter fee in connection with Doe's placement, see ante, the fact remains that Foley provided LegalBriefs assurances that it was giving active consideration to a modification or waiver of the Fee Cap. On the basis of these temporizing statements, which Plaintiff alleges to have been knowingly false (an inference the Court cannot foreclose given the timing of things here [16]) , LegalBriefs maintains that it relied to its detriment in providing an especially diligent and time-intensive recruitment service in support of Doe's placement at Foley. This is enough state a claim.
            Foley argues that, given the fact that the law firm never agreed to waive or modify the Fee Cap, LegalBriefs cannot claim to have relied upon a commitment it never made. Perhaps. But LegalBriefs (at least in its Chapter 93A claim) maintains that what it relied upon were Foley's false assurances that a higher fee for the Doe deal was under genuine consideration, assurances the recruiter claims it relied upon to invest more of its time and effort than it
 
--------------------------------------------
 
[16] Whether Foley would or would not agree to relinquish its rights under the Fee Cap in the case of Doe is not an especially complex issue. To have put off LegalBriefs for some five weeks (first with successive verbal assurances that the law firm was giving the matter consideration, and then with silence as the parties worked to close the Doe deal) might permissibly be construed as a deliberately deceptive string-along. Particularly given the alacrity with which Foley shut this particular window on LegalBriefs' fingers immediately after securing Doe's placement at the law firm.
 
                                                            -23-
 
otherwise would have. The Complaint also plausibly suggests that. but for Foley's (allegedly) false statements raising the prospect of LegalBriefs recovering an uncapped fee, LegalBriefs could have (and would have, without breach) abandoned its work on the Doe transfer to Foley and/or assisted him/her in pursuing an alternate placement. What this means is that, while LegalBriefs may not be able to capture an uncapped fee equal to 25% of Doe's first-year compensation via Chapter 93A, it might theoretically recover the value of the incremental time and effort it expended during the period after Foley Jed it to believe a modification or waiver of the Fee Cap might be forthcoming. See Bump, 24 Mass. App. Ct. at 312 (expended time treated as "loss of money or property" under Chapter 93A); Arthur D. Little, Inc. v. Dooyang Com. 147 F.3d 47, 57 (1st Cir. 1998) (same). While this claim might not be especially strong as a matter of liability or damages,[17] it has just enough of both to survive Rule l2(b) scrutiny.
 
--------------------------------------------
 
[17] The reasonableness of LegalBriefs' claimed reliance for liability purposes is open to rather substantial doubt Consideration is an assurance of very little, and a guarantee of nothing; and, for the most part, this recruiter was providing administrative services it was already under an implied contractual duty to furnish if it wanted a placement fee following Doe's hiring by Foley. It was also delivering services it independently had every incentive to provide, given that LegalBriefs could not otherwise be assured of collecting any placement fee at all. More worrisomely for LegalBriefs, a factfinder (the Court, per Chapter 93A) may well reject the charge that Foley was deliberately attempting to mislead LegalBriefs with false assurances. It might regard Foley as the victim of an extortion-style attempt to hold up a lucrative partner placement unless an opportunistic recruiter were paid more money than called for under its contract. A factfinder might fairly conclude in these circumstances that Foley had no duty to say anything more than it did about the Fee Cap, and that putting off a bad actor was turn-about fair play. Finally, a factfinder might simply choose to credit Amy Moynihan's explanation of why it took Foley more than a month to run the matter of LegalBriefs' placement fee demand to ground: to wit, the law furn was preoccupied with more pressing matters, like the year-end compensation of its own partners. As for damages, it is hard to argue that LegalBriefs was harmed economically when it received the maximum $500,000 fee for a single partner placement to which it was entitled under the parties' written contract. Moreover, while the surviving Chapter 93A claim might allow LegalBriefs to recover damages for the incrementally greater effort it expended to support Doe's placement at Foley, this will be a very narrow needle to thread. It appears that many (and likely all) of those services were implied contractual obligations of the recruiter under the existing Fee Agreement. And while LegalBriefs might somehow convince a jury that it provided especially responsive service to Foley, and would otherwise have done no more than the required minimum had it known that there would be no chance of receiving a higher placement fee, translating the theoretical delta between those two levels of effort into dollars and cents damages will likely prove challenging. And not especially remunerative.
 
                                                            -24-
 
CONCLUSION AND ORDER
            For all the foregoing reasons, the Defendant's Motion to Dismiss shall be ALLOWED as to Counts II, III and IV of the Complaint, and shall be DENIED as to Count I of the Complaint.
SO ORDERED.
/s/Robert B. Gordon
Justice of the Superior Court
February 25, 2025